61 F.3d 903
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Elizabeth CUEVAS, Plaintiff-Appellant,
v.
LORAIN METROPOLITAN HOUSING AUTHORITY, Defendant-Appellee.
 No. 94-3539.
 United States Court of Appeals, Sixth Circuit.
 July 26, 1995.
 
 Before: KENNEDY, JONES, and KRUPANSKY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff Elizabeth Cuevas, who is white, non-Hispanic, and over forty, is appealing a magistrate judge's[1] grant of summary judgment to Defendant Lorain Metropolitan Housing Authority ("LMHA") regarding Cuevas' claim that she was terminated in retaliation for her attempt to obtain equal opportunity employment through the filing of discrimination charges with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), which alleged that LMHA had denied her a promotion on the basis of her age, 29 U.S.C. Sec. 623 (1988), and/or national origin, 42 U.S.C. Sec. 2000e-2 (1988 & Supp. V 1993). In her lawsuit, Cuevas also claimed that LMHA continued to retaliate against her for filing employment discrimination charges with the OCRC and the EEOC by refusing to rehire her for numerous jobs for which she applied and for which she was qualified between July 1, 1992, and the date of her complaint, January 21, 1993. We affirm the lower court's decision.
 
 I.
 
 2
 A review of the record reveals the following sequence of events. LMHA hired Cuevas on February 16, 1987, as a part-time Clerk-Typist. After receiving four favorable "Efficiency Rating" reviews from August 1987 through August 1989, Cuevas was awarded a full-time position as Secretary/Scheduling Officer.
 
 
 3
 In December 1989, LMHA promoted Cuevas to the position of Assistant Manager. This position served as a temporary substitute for any of the other regular managers. Both Cuevas and Sue Gracia, a Hispanic female, under forty years of age, applied for the Assistant Manager position, but LMHA Executive Director Vera Stevovich chose Cuevas for the position because she was older, more mature, and able to adapt to moving from development to development when substituting for the regular managers.
 
 
 4
 On January 8, 1990, Cuevas received a fifth review, and she was awarded an 8.5 on a scale of 10. Her superiors stated that she worked well under pressure, was loyal and reliable, a hard worker, and a pleasure with which to work. On January 31, 1990, Cuevas was reviewed by the first of three managers among which she would be rotated, and she received a rating of 6.3 on a scale of 10. On February 23, 1990, Stevovich upbraided Cuevas for excessive tardiness. Cuevas was one of the worst six offenders in this regard, and she received a written reprimand.
 
 
 5
 In March 1990, a second manager, Debbie Kimbrough, rated Cuevas at 7.7 on a scale of 10, but she stated that Cuevas would be a better worker if she took the time to do her work correctly. Kimbrough claimed that Cuevas made several careless mistakes. In October 1990, a third manager rated Cuevas at 6.3 on a scale of 10. Janice Kennard, who wrote Cuevas' evaluation in October 1990, stated that Cuevas needed to pay more attention to detail and documentation and also not be so concerned with gossip, which detracted from the concentration needed in her position.
 
 
 6
 During the first half of 1991, Cuevas was allegedly placed in competition with Sue Gracia for the position of manager. In August 1991, LMHA advised Cuevas that she had received the certification required for the position of Manager, and that Gracia had failed the certification exam (Gracia later passed the certification exam on September 20, 1991). On August 29, 1991, Cuevas sent a letter to LMHA's Executive Director, Vera Stevovich, and inquired as to the status of her position in light of the certification results. Around September 19, 1991, Cuevas was called into a meeting with Stevovich, LMHA's Assistant Director William Neal, and Affirmative Action Hearing Officer Homer Virden, to discuss the letter that she sent to Stevovich. During the meeting, Cuevas suggested that LMHA was discriminating against her or in favor of her competitor, with respect to the possible promotion to the managerial position. Cuevas alleges that in response Neal treated her in a hostile manner. Moreover, Cuevas alleges that after the meeting, Stevovich's attitude toward her was noticeably less friendly.
 
 
 7
 On September 30, 1991, Cuevas sent a letter to LMHA's Board Members and sought clarification of the events that were transpiring and of her employment status. After receiving no explanation from LMHA's legal counsel except a letter advising her to be patient, Cuevas filed charges of age and national origin discrimination with the EEOC and the OCRC.
 
 
 8
 In November 1991, a consultant, Belz & Associates ("Belz"), was hired to develop a compensation system and job descriptions for LMHA.
 
 
 9
 In February 1992, Cuevas received another performance review, and she was rated 8.2 on a scale of 10. Her superior stated that Cuevas was a very reliable and valuable employee. The superior was confident that Cuevas could handle things when the superior was absent.
 
 
 10
 In March 1992, the EEOC found no probable cause to support Cuevas' charges of age and national origin discrimination.
 
 
 11
 On March 25, 1992, LMHA's Board passed a resolution accepting Belz's work product, which included a conclusion that Cuevas' "job position did not make any sense" because it "combined managerial and clerical duties at a managerial rate of pay." J.A. at 67. Between March 25, 1992 and April 25, 1992, LMHA decided to eliminate Cuevas' position from the 1992-93 budget and to terminate Cuevas' employment.
 
 
 12
 On June 17, 1992, Virden allegedly advised Cuevas that her employment would be terminated effective July 1, 1992, and that she would be considered for future positions that became available because it was customary for LMHA to fill an open position with former employees before hiring from the outside. From April 27, 1992, the date that LMHA's Board approved its budget for the upcoming fiscal year, until July 1, 1992, the date that Cuevas' employment actually ended, LMHA had two budgeted, unfilled positions for which Cuevas allegedly was qualified, but neither of the positions was offered to her.
 
 
 13
 In July 1992, Nina Jachym, LMHA's Finance Director, allegedly told Cuevas that Neal had said that Cuevas would probably still be employed by LMHA if she had not filed her charge of discrimination. In her affidavit, Jachym denies she ever had such a conversation.
 
 
 14
 From July 1992 through January 1993, LMHA posted notices and/or advertised available employment for eight different positions for which Cuevas allegedly was qualified, including Operations Manager, Grade 2 Clerk Typist, Section 8 Manager, P/T Receptionist/Operator, Section 8 Occupancy Specialist, Public Housing Manager, Development Secretary, and Public Housing Manager Trainee. Cuevas applied for the positions of Grade 2 Clerk Typist and Operations Manager. Virden called Cuevas to see if she was interested in the clerk/typist position, but after she applied, Virden sent her a letter advising her that she had not been accepted for the position and that her application would be kept in the files for six months and if a position became available for which Cuevas appeared qualified, LMHA would contact her. Virden and Peggy Byrd stated that a better applicant, who was currently employed by LMHA, was chosen for the clerk typist position, and Byrd further stated that she did not trust Cuevas because she felt Cuevas was a blabbermouth and a gossip. Similarly, LMHA claims that a more qualified person was chosen for the Operations Manager position, and Cuevas agreed with this conclusion in her deposition. Cuevas did not apply for any of the other positions because she thought it was unnecessary to apply, since she was told that her resume would be kept on file.
 
 
 15
 On January 21, 1993, Cuevas filed the instant suit against LMHA, and on April 11, 1994, a magistrate judge granted LMHA's Motion for Summary Judgment. This appeal followed.
 
 II.
 
 16
 "We review a district court's grant of summary judgment de novo.... [I]n a motion for summary judgment, 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' " Russo v. City of Cincinnati, 953 F.2d 1036, 1041-42 (6th Cir.1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and citing Vollrath v. Georgia-Pacific Corp., 899 F.2d 533, 534 (6th Cir.), cert. denied, 498 U.S. 940 (1990)).
 
 
 17
 Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 229 (6th Cir.1990). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
 
 
 18
 Cuevas claimed that LMHA terminated her employment and refused to rehire her in retaliation for the employment discrimination charges, based on age and national origin, that she filed with the EEOC and the OCRC pursuant to Title VII, 42 U.S.C. Secs. 2000e to e-16, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Secs. 621-33a.
 
 A. Retaliation for Title VII Claim
 
 19
 To sustain a claim of retaliation for filing a Title VII complaint, an employee must establish the following by a preponderance of the evidence: (1) that she engaged in an activity protected by Title VII; (2) that this exercise of her protected civil rights was known to the defendant; (3) that the defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. Canitia v. Yellow Freight System, Inc., 903 F.2d 1064, 1066 (6th Cir.), cert. denied, 498 U.S. 984 (1990).
 
 
 20
 If a plaintiff establishes a prima facie case, based on these four factors, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Assuming the employer meets this burden of production, the plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate " 'that the proffered reason was not the true reason for the employment decision.' " Id. (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).
 
 
 21
 Regarding the Title VII retaliatory discharge claim, the magistrate judge held that Cuevas met her burden of presenting a prima facie case of retaliation. J.A. at 16-17. This is not an onerous burden. Kolb v. Department of Mental Retardation & Developmental Disabilities, 721 F.Supp. 885 (N.D.Ohio 1989). Once Cuevas established her prima facie case, the burden of production shifted to LMHA to articulate a legitimate, nonretaliatory reason for the adverse employment action. Canitia, 903 F.2d at 1066, 1067.
 
 
 22
 In its Motion for Summary Judgment, LMHA stated that Cuevas was dismissed because LMHA eliminated her position upon the recommendation of Belz, an outside consulting firm, which determined that Cuevas' position was unnecessary because it combined clerical and managerial duties at a managerial rate of pay. As to the possibility of being rehired, LMHA stated and supported by affidavit that Cuevas was not hired for the positions of operations manager or clerk/typist because other candidates were more qualified or candidates, who possessed qualifications equivalent to Cuevas, were already employed by LMHA. In the latter instance, LMHA's hiring policy was to hire from within the organization when possible because it promoted the morale of the work force.
 
 
 23
 Based on these facts, the magistrate judge determined that LMHA had articulated a legitimate, nonretaliatory reason for terminating Cuevas' employment and for not rehiring her. J.A. at 18. Cuevas concedes that LMHA met its burden of production. Cuevas' Br. at 21. At this point, the burden shifted back to Cuevas to meet her ultimate burden of persuasion that the proffered legitimate reason for the adverse employment action was merely a pretext for discrimination. See Canitia, 903 F.2d at 1066.
 
 
 24
 Viewing all the evidence in the light most favorable to Cuevas, the magistrate judge determined that Cuevas did not demonstrate that LMHA's reason for her dismissal and for not rehiring her was actually a pretext for retaliation for filing the previous discrimination claims. Thus, the court, finding no genuine issue of material fact, granted summary judgment to LMHA.
 
 
 25
 After reviewing de novo the record and the arguments of the parties on appeal, we agree with the magistrate judge that no material issue of fact remains for trial regarding Cuevas' Title VII retaliation claim.
 
 B. Retaliation for ADEA Claim
 
 26
 The same burden-shifting paradigm used for retaliatory discharge claims in the Title VII context also has been utilized by this court for retaliatory discharge claims in the ADEA context. See West v. Fred Wright Constr. Co., 756 F.2d 31 (6th Cir.1985). Cuevas cites no additional evidence or arguments, other than those already noted above, to support her claim of retaliatory discharge for the filing of her age discrimination claim. Thus, in similar manner, we agree with the magistrate judge that no material issue of fact remains for trial regarding Cuevas' ADEA retaliation claim.
 
 III.
 
 27
 Based on the foregoing analysis, we AFFIRM the magistrate judge's grant of summary judgment to LMHA on Cuevas' retaliation claims.
 
 
 
 [1]
 On April 29, 1993, both parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. Sec. 636(c)(1)